We're happy to hear argument in Armento v. Asheville Buncombe, number 21100. Good afternoon. Good afternoon. May it please the court. I'm Claremont Ripley from the North Carolina Justice Center, and I'm here with my colleague Carol Brook on behalf of Appellant Gregory Armento. The primary question before you today is whether Mr. Armento was an employee or a volunteer when he performed unpaid labor for the Appellee Asheville Buncombe Community Christian Ministry or ABCCM under the North Carolina Wage and Hour Act. According to the Supreme Court and Tony and Susan Alamo Foundation v. Secretary of Labor, the appropriate test for distinguishing between an employee and a volunteer is to look at two factors, whether Mr. Armento worked in contemplation of volunteer. Pursuant to that test, the Alamo test, Mr. Armento was an employee. However, the trial court did not follow the Alamo precedent. Which legal test or which legal framework applies and the ultimate question regarding employee status are both legal conclusions entitled to de novo review. Now, I'm here to answer your questions, but if I have time, there are three things I'd like to cover in addition to why the Alamo test is correct. First is that when someone is considered an employee, they are entitled to all of the Act's protections unless an exemption applies and there are no applicable exemptions here. Second is that the primary beneficiary test is not appropriate, but under a proper application of that test, Mr. Armento is an employee. And finally, I'd like to talk about how the relationship between Mr. Armento and ABCCM falls within the purpose and the scope of the Act and therefore the approach from Steelman v. Hirsch and that analysis is not appropriate either. So turning first to the Alamo Foundation, there the Supreme Court said that a volunteer is an individual who without promise or expectation of compensation, but solely for his personal purpose or pleasure, works and activities carried on by other persons either for their pleasure or profit. The trial court made only one reference to Alamo for the proposition that an individual's understanding as to whether he would be compensated may be relevant in determining their employee or volunteer status. And because the court found that Mr. Armento knew his service hours would be unpaid, it did not do any further analysis of those factors. But in Alamo, the Foundation residents that the Supreme Court found to be employees also did not expect to be paid. They in fact said they did not want to be paid and they testified that they had no expectation of receiving a paycheck. However, the Supreme Court said that they were still working in expectation of contemplation because they worked in expectation of receiving room and board from the Foundation. The same is true here and that's supported by, that's in the factual findings from the trial court, that Mr. Armento received free room and board and that he performed those service hours to continue receiving that free room and board because if he did not perform them, he could have been kicked out of the shelter where he lived. The trial court also, excuse me, the other... Ms. Ripken, let me ask you this question. Do either one of these programs constitute a market-driven exchange of labor for value? Are you, you're asking about does either Alamo or ABCCM? No, the programs in this case, are they market-driven? Once ABCCM decided to run this shelter and hire people to work for it, then it became a business. And I mean, I recognize that it's a nonprofit, but that does not mean that it doesn't have to operate and keep its business running. So, I mean, I know that ABCCM has brought up this market-based exchange of labor, but Mr. Armento worked for them for pay. He did not pursue other jobs while he was working for them for pay because he thought he was employed. So, I mean, it was an exchange of labor. It was a bargain for exchange of labor. Judge Rushing, I believe you were trying to ask a question as well. Yes. You said that the record and the record of the Alamo, where they, the individuals were receiving room and board as their compensation, and that those things would be withheld, and in fact, were withheld from people who didn't work sufficient hours. That's not, that was not my understanding of reading the district court's findings here, was that in fact, people who weren't able to do service hours at this facility still received room and board, and that it wasn't, they weren't working to receive it, they received that room and board gratuitously, and then part of the, you know, part of the rehabilitation is that you perform some sort of service hours either at ABCCM or somewhere else. It's finding a fact, paragraph 13, which is on the appendix on page 799 that I'm primarily referring to, where the trial court said that ABCCM had this three strikes policy, and that if residents did not comply with the rules, they could be kicked out, and service hours were one of those rules, or one of those requirements. It is true that ABCCM... But service hours don't have to be at ABCCM, right? Right. Their paperwork does say that they could be elsewhere. But the service hours that Mr. Armento performed at, were at ABCCM, and that is the only issue that is before the court. I think whether service hours performed elsewhere might be legal is a different issue, and this court doesn't have to decide that. Well, no, it's not. We're not deciding the factual question. The reason it's relevant is because it helps us understand whether this was a requirement that you're working to earn your room and board, or whether this work requirement is related to the rehabilitation, rather than to some sort of way to pay for your room at the shelter. I understand, Your Honor, but there's no exception from the Wage and Hour Act for work that is rehabilitative, and work can be both rehabilitative and employment. Alamo recognized that. There's a case about Salvation Army, Williams v. Strickland from the Seventh Circuit, or the Ninth Circuit, excuse me, that also recognizes that, that work can be both rehabilitative and employment. And it goes back to that issue that if there's an employer-employee relationship, that Mr. Armento is protected, is entitled to protections unless an exemption applies. There's also no exemption for nonprofits under the Wage and Hour Act. There's not an exemption just because ABCCM was doing good charitable work. Once they entered into this comply with the rules, and under Alamo Foundation, Mr. Armento was their employee. There's an important distinction, I think, though, between this case and Alamo Foundation, and that is that Alamo was under the Fair Labor Standards Act, which means the court spent a great deal of time analyzing whether they were engaged in commercial activity, because that's a requirement for the Fair Labor Standards Act to apply. That is not a requirement for the Wage and Hour Act to apply. So all of the emphasis that court put on commercial activity in the application of the act is not useful here in determining whether he is an employee. The other test that is useful is the economic realities factors that this court laid out in Schultz, adopting Supreme Court factors from long ago in U.S. v. Silk. And that test, I think, is very useful when we look at Mr. Armento. He spent at the front desk working according to a schedule, time that ABCCM considered him an employee, under a supervisor, filled out employment forms. If you look at the economic realities factors, he was clearly an employee during that time period in an employee-employee relationship. And those service hours, excuse me, those front desk hours, the time he spent working at the front desk as paid employment was absolutely indistinguishable from his front desk work that was considered service hours. The only difference was whether it was paid or not. And in fact, whether it was paid or not was up to how ABCCM classified it, and they could even reclassify it retroactively. There's a spreadsheet included in the trial court's findings of fact and a discussion about the operations manager reclassifying some of his hours as service hours or as not service hours afterwards. So the fact that he was already in an economic relationship and economically dependent according to those Schultz factors when he was working at the front desk shows that all of his time working at the front desk should have been considered employment. I'd like to quickly turn to the primary beneficiary test, which the lower court discussed, because that test is not appropriate here for the same reasons I've been saying that Mr. Armento was compensated. And the Supreme Court said that without a doubt, if someone works in contemplation of compensation, they are covered by the act. If a trainee, excuse me, works in contemplation of compensation, they're covered by the act. Here, as I've been saying, Mr. Armento did work in contemplation of compensation, both in the form of room and board and also for the actual wages he did receive. But how do we determine that by just what the testimony is of your client? I believe there are facts in the record showing that he was paid $9 an hour. There's actually stipulations that he was paid $9 an hour. I'm talking about the question about his compensation, that he's going to be paid for every dollar he works. Well, I don't think it doesn't have to be that he's going to be paid for every dollar he works. Well, I thought that's what your whole claim was about. Really? We are asking that he be paid for everything that is considered work under the Wage and Hour Act. But if he didn't compensate, I thought you also said to us that what we look to is what he compensates, what he believes he's going to be paid for. That seems to me that can't be the standard. Right. No, I don't think that is. I was actually saying what he believes he's going to be paid is not as important as what actually happened. And that's what the Alamo court looked at, that those residents did not believe they were going to be paid, but they were still employees because of the compensation that they received for their work. Here, we dispute the finding that Mr. Armento knew he was going to be working for free, but that's immaterial actually, because he was in fact compensated at $9 an hour for some of his time. And for the rest of his time, he was still compensated in the form of room and board. According to the Supreme Court, that's the same as wages. It's not the same as wages that you can play it off against each other. I mean, we know that that's forbidden by statute. In other words, you can't say, well, I'm going to give you a house to live in and that's going to be a wage and comply with the federal law, right? No, you're right. It has to be tracked. There are all kinds of regulations. The regulations say that furnishing room and board and other facilities can count as wages, but there are certain requirements. There's another factor from Alamo Foundation that I don't know that I've mentioned that's important, and that is whether he actually was working freely and volunteering freely, or whether there was some sort of economic coercion. And that, again, this fact that the service hours were required, and if he stopped performing service hours, he could have been kicked out, that is the same kind of coercion that the Supreme Court recognized in Alamo when they found that the Foundation residents were employees. This court has discussed similar factors in Benshoff v. City of Virginia Beach, where firefighters said they should have been played for volunteer time, and the court said, well, they weren't required and they weren't asked to do that time, so they weren't coerced to volunteer. The opposite is true here. Mr. Amento was required to perform service hours. Therefore, the court should find that he wasn't freely volunteering that time. Thank you, counsel. The other thing I wanted to say quickly is that in Harvard v. PPE Casino, I recognize I'm out of time. If you'd like me to finish this thought, or should I? Yes, finish the sentence. In Harvard, the court said that another way to look at this is whether time spent volunteering or time spent as a trainee counts as compensable work. And the focus there, if I can find it, is that work broadly encompasses physical or mental exertion, whether burdensome or not, controlled or required by the employer. So that's another framing we can look at to say that his time spent performing these service hours, which were integral and essential to the running of the ABCCM shelter, were work that should be considered compensable. Thank you, Your Honors. Thank you. Counsel? Your Honors, my name is Jonathan Dunlap. I'm with the Van Winkle Law Firm here on behalf of ABCCM, the defendant in this case. And may it please the court, the question we would submit is much broader than whether or not Mr. Armento was working as a volunteer. The question is whether or not he had an employer-employee relationship with ABCCM. The case central to our appeal is the Steelman v. Hirsch case. That case involved two romantic partners who operated a business together. The dependent was the sole proprietor. The plaintiff worked full-time for the business, and when the relationship ended, the plaintiff sued, claiming, among other things, that she was entitled to back pay under the Fair Labor Standards Act. This court said that when considering the question of whether someone was an employee for purposes of the Fair Labor Standards Act, the court must look to the economic realities of the situation. The standard calls for pragmatic construction of the concept of employment. The court must therefore look broadly to the circumstances of the whole activity rather than to isolated factors or technical concepts. The court also specifically rejected the use of the six-factor test used in the independent factor context and the one that the plaintiff is advocating for here on appeal. Counsel, if I could ask you, if we do not have a volunteer employer context and we don't have an independent contractor employer context, how would you characterize the plaintiff's role here? I would characterize it as a work rehabilitation program, Your Honor. Yeah, yeah, yeah, yeah, yeah, yeah. That's not the answer to my question. You're the employer. What's the person on the other side if he's not a volunteer, not an independent contractor? He's a participant in this program. He's a voluntary participant in this program. The reason I think that the Steelman case is so important for us is that Steelman said when we're looking at, when we're trying to answer this question, the Steelman court recognized limitations on the definition of employee is not exclusive to trainees. The Steelman court said this relationship that we have here, we don't know what to call it. We don't know what it is, but we know what it's not. It's not an employer employee relationship. So whenever we answer that question, we don't have to specifically answer what the relationship is. As long as the answer is that it is not an employer employee relationship, the act doesn't apply. Now the Steelman court looks at the totality of circumstances and then it asks two questions. The first question is whether the relationship of the parties has deviated from the traditional understanding of employment in fundamental ways. If it does, the court will not shoehorn that relationship into the act. The second question is whether the application of the act to the relationship will advance the act's objectives. So turning to this case, asking the first question, looking at the totality of circumstances, what makes this relationship different from the traditional employment relationship? First, this is an artificial job market created specifically for participants of the work rehabilitation programs or in times of shortage, community volunteers. No one here is displacing a bona fide applicant desiring to sell their services at prevailing rates. Nobody here is working for any profit making activities. Everyone's working for the non-profit branch of ABCCM. They don't handle, buy, or sell goods in commerce. The work is primarily oriented towards rehabilitation and improving the very place where they live. Two, this is not the competitive job market. The indispensable prerequisite for this job is a history of homelessness. This is highly suggestive of a lack of employability in the open marketplace. In fact, the work, evidence shows the work could be done more efficiently and effectively by ABCCM's volunteers. I would also note in the competitive job market, one does not normally engage an individual in order to rehabilitate them. Instead of terminating problematic employees, they receive skilled counseling. The program relentlessly pushes workers to find outside employment. The term of engagement is fixed. It's two years. So no matter how efficient they become, they're replaced by someone who's not told these are unpaid hours. This is not a bargain for exchange for labor for mutual economic gain. They're told that at the outset. The biggest difference between this job and a normal job is you don't even have to do it. You can opt out of it by working for someone else. You can opt out of it by just going to school, which Armino is doing, well, is what he did when he left the program. Here, Armino was excused from the program altogether, even though none of those exceptions applied to him for about seven months because the program was so concerned with his lack of progress finding an outside job. People who don't do this work for the VRQ still get every benefit, free room and board, enjoyment of all the amenities there. So there's no bargain for exchange of work for value. Residents get value even if they're not working for the VRQ. This is all in sharp contrast to a traditional marketplace employer who would hire based on the knowledge, skill or experience of the applicant in a bargain for exchange of labor for mutual economic gain where employers incentivize employees to remain as long as the employee's work maintains or increases in efficiency and where the employer would terminate any benefits of the person, for the person, if he or she were to find outside employment. And once again, the traditional marketplace employers don't hire someone with the goal of rehabilitating them. So this relationship, we've answered the first question of Steelman, that this relationship deviates from the traditional understanding of employment in all those fundamental ways. Steelman next instructs us to review whether the application of the act would further its purposes. Like the Fair Labor Standards Act, the policy of the North Carolina Wage and Hour Act is to protect those who, as a matter of economic reality, are dependent upon the businesses to which they render service. The entire purpose of the service hours program is to transition participants out of it. Otherwise stated, it's a program that's designed to reduce dependence upon itself. Applying the minimum wage protections of the North Carolina Wage and Hour Act to this program, however, would create reverse incentives by paying participants to stay in these sheltered positions. The participants are more likely to remain outside of the enfranchised workforce and marginalized from the general public. This, in turn, directly contradicts a larger goal of empowering homeless participants to become self-sustaining members of society rather than permanent dependents of an entitlement program. Applying the North Carolina Wage and Hour Act would not likely result in getting people paid. The record would show that if they had to start paying people for service hour work, the first thing that would happen is they would reduce their services. They would no longer have, for example, the shuttle service because they don't need it to qualify for the GPD funding. It would result in community volunteers doing all this work. They would be the ones coming in and cooking for the residents and cleaning up after them. This would result in a surplus of idle time among the least employable residents of the VRQ, which, in turn, would lead to an exacerbation of the mental health and substance abuse issues that led so many of to this place in the first place. Placing a program that helps homeless veterans transition into independence with idle time that tends to lead them into self-destructive habits would not promote the goals of the North Carolina Wage and Hour Act. Extending the North Carolina Wage and Hour Act to the service hours program would also not prevent the unfair competition that arises when businesses cut their pay, I'm sorry, business cut their cost by paying low wages. Participants in the program are not displacing a bona fide applicant desire to sell his services at prevailing rates. In fact, Land of the Sky would not have permitted the SCSEP participants to hold these positions if it resulted in the displacement of marketplace employees. Service hour positions are in direct service to the nonprofit entity. Primarily, I'm sorry, those positions, they primarily serve to improve the participants' own living space and do not result in a profit to ABCCM. Accordingly, service hour work does not give ABCCM any kind of advantage in a commercial or marketplace activity. Another point is that minimum wages are not necessary to maintain a minimal standard of residence. Basic needs are met here irrespective of their ability to pay. And I would refer the court to the discussion in the Vanskegee v. Peters case, the Seventh Circuit case we've cited there. That's a prison labor case where the court decided, for among other reasons, the Fair Labor Standards Act didn't apply because it wasn't necessary to, I'm sorry, that it would not the prison workers would not improve their standard of living. The standard of living was set by their living space. Well, that's similar here. The standard of living is provided for. This minimal standard of living that these laws are intended to protect are set by the program itself. Finally, as the district court recognized, application of the North Carolina Wage and Hour Act could adversely affect a broad range of charitable activities across the evidence in the case shows that there's actually a number of other programs that have come to ABCCM and they've based their program on what they've seen there. So, applying the North Carolina Wage and Hour Act programs, this program would result in the application of it, presumably, to many others and would have a chilling effect on the motivation of these non-profits to provide programs that primarily benefit these participants and transition them to stations of greater self-reliance. So, just in conclusion, if you look at the, we follow the model of the Steelman case and we look at the totality of the circumstances here. We first look at whether this relationship deviates in a fundamental way from the traditional employment relationship and it most certainly does. This does not resemble a traditional employment relationship. Second, the application of the act, as we just discussed, would not further the purposes of the act and, in fact, would probably contradict the purposes of the act on some level. I would like to touch on one point here. We talked about, I know plaintiffs said if you didn't do service hours you'd get kicked out. That's not necessarily true. As we've discussed, there's a lot of ways to not perform service hours, including what happened to Armento where there was so much alarm and his failure to make progress in the program that they just excused him from those. But the program has a three strike policy and if you get a third strike, let me read you what happens from the manual. If you get a third strike, the resident will receive referrals to other housing, treatment, or shelter programs and a timeline to depart the facility temporarily or until conditions are met. Our goal is to never discharge anyone to the street. Is that all, Captain? That's all of my presentation. If the court has any questions, I'd be happy to answer them. Otherwise, I would yield the floor to my colleague. I don't hear any questions, so we'll hear if there is any rebuttal. I'm sorry, Your Honor. I don't hear any questions, so I think we'll see if there is any rebuttal from the other side. Yes, Your Honor. You reserved five minutes for my colleague's presentation. Right. We're about to go to that. Oh, you have a colleague here. Sorry. Sorry. Yes, good afternoon, Your Honor. Good afternoon. And Judge Floyd and Judge Rushing, may it please the court. My name is Dale Curidan and together with Mr. Dunlap, we represent ABCCM. And as we sort of conclude, near the conclusion of our presentation, I'd like to emphasize a few key facts that are critical throughout the analytical framework of this case. First of all, Gregory Armento did not come to Veterans Restoration Quarters looking for a job. He came there because he was homeless. He needed shelter, needed stabilization, needed a roof over his head, and an opportunity to help develop self-sufficiency and self-determination. On the other side of the coin, Veterans Restoration Quarters did not open its doors to Greg Armento because they were looking for employees. There was not the same exchange of labor for wages as there is in a true employment relationship. And trying to force this situation into the definition of employment under the North Carolina Wage and Hour Act is like trying to fit a square peg through a round hole. In other words, to say that the economic realities of this situation amounts to employment is really to disregard reality to a great extent. According to Reverend Scott Rogers, the Executive Director of ABCCM and one of the founders of the Veterans Restoration Quarters back in the late 1980s, the primary purpose of the Veterans Restoration Quarters, and this is a quote from the Joint Appendix, page 565 over to 566, the primary purpose of the VRQ is to bring homeless veterans in off the streets, to provide shelter and stabilization, and to facilitate self-sufficiency and self-determination. In addition to providing shelter, this larger mission involves addressing physical and mental health conditions, substance abuse, isolation, and a variety of other conditions that led to their homelessness. And as for the service hours program in particular, he said that it is again part of residents rehabilitation. The primary purpose is for their benefit, not for the benefit of ABCCM or the VRQ. He said, and this is a quote from the Joint Appendix, page 568 to 569, it's not just about caring for the facility, it's about the ways to relate with each other, teach them how to be responsible, and how to have healthy living standards in their own lives. With regard to the, and that was with regard to the service hours program, with regard to the temporary employment program, and this is also in the record in the Joint Appendix at page 544 to 545, he said the purpose of that is part of our work readiness. This provides us with a way to give residents a temporary employment along with a brief work history that we could responsibly and with integrity say to employers that they have been able to perform these duties and those duties, and it gives them confidence that they can have these residents on their job site. And these programs are successful. Recall that all of the Veterans Restorations Quarters, a prerequisite for their becoming a resident there is homelessness. So everybody there came there from a place of homelessness. And yet, as Reverend Rogers points out, eight out of ten of them leave the Veterans Restorations Quarters in two years or less with stable income and permanent housing. And considering where they've come from, not just in a place of untreated, other conditions that led them to the place of homelessness where they were is a major accomplishment. That type of a success rate. And to force, again, to force that the square peg of this situation through the round hole of the legal definition of employment would be to eviscerate a program that has proven to be effective for countless homeless Veterans for over three decades. And Mr. Dunlap alluded to this, but when asked what would happen if ABCCM were required to pay minimum wage for service hours, Reverend Rogers said there just isn't funding to pay for that. And so when there isn't funding, what they do is they deploy their community volunteers. So you would have this absurd result where the residents who are the ones in need of structure and community and a sense of purpose and engagement are left to sit idle while community volunteers come in and maintain the place, cook the food, clean up, and do the things that, according to Reverend Rogers, is the very purpose of having these programs for the rehabilitation of the residents. And for those reasons, we encourage the court to affirm the district court's opinion. And I see I'm out of time. I'm happy to answer any questions the court may have. I don't think we here have any questions. Thank you very much. Thank you, Your Honor. May it please the court, my name is Carol Brook and together with Ms. Ripley from the North Carolina Justice Center, we represent Gregory Armento. I wanted to address the standard of review that this court should apply when considering the issues in front of it and state that under Shultz, the Shultz factor or the Shultz test, this court should provide a de novo review for the legal questions that are in front of it, which are the issue of whether Mr. Armento was an employee covered by the North Carolina Wage and Hour Act, and whether the district court applied the correct legal test, the Llamo test. And because these are legal questions, the court should provide a de novo review on those issues. The appellee spent very little time looking at Llamo, but the Supreme Court set out a test that looks exactly at what an employer-employee relationship is in a similar situation to what we have here. And in Llamo Foundation, the court looked at the economic realities of the relationship between the parties and said that where there is an economically dependent relationship in which there is an element of economic coercion and an expectation of compensation in the form of room and board, that the person at question is an employee and is not a volunteer. In this situation, we have more. We have Mr. Armento being paid by ABCCM $9 per hour, supervised by an ABCCM employee who performed work essential to the good services at the Veterans Restorations Quarters. He was recruited for his job because of his skills and because of ABCCM's need. That evidence is found in the joint appendix at page 752. And ABCCM referred to Mr. Armento as their employee. They, in fact, stipulated to that relationship being an employer-employee relationship. Then ABCCM required Mr. Armento to do identical work that was unpaid. And ABCCM determined, in fact, when it would and would not pay him during the same work week. The goals of their unpaid work program don't matter. It's admirable that ABCCM is a charitable organization that provides important services to the veterans community in Asheville. But what matters as a matter of economic reality is that for Mr. Armento, he performed many hours of work each week for pay. But even when he did not perform work for wages, he performed work in the expectation that he would continue to receive room and board from ABCCM. Did ABCCM provide room and board for persons who did not perform paid work for them? Yes, they certainly did. That's not the issue in front of this court. But if the court does want to consider that issue, it should follow the Alamo Foundation holding as well and look again at whether there's an economically dependent relationship based on the expectation of compensation in the form of room and board and an economically coercive situation. Here with a homeless population of veterans who are needing to leave the shelter within a specified time period, they are clearly economically in need and economically dependent on the shelter for their room and board until such time as they leave. But as I understand the record, your client could go work for somebody else and that would be fine with the board. Yes, Your Honor, that's correct. He could work for another organization, although the record does not show that many people did do that. But he could have done so. However, if he had done so, then he did work for ABCCM and he did work that furthered their mission. He did work in expectation of compensation from them. That he could have received that compensation without working for them directly is immaterial. The fact is that he did work for them. There has been some discussion of whether the fact that the work was not available in the North Carolina Wage and Hour Act. Usually those discussions are in the context of whether the Fair Labor Standards Act is involved, whether there's interstate commerce involved, and that's not an issue in this case. We're talking about the North Carolina Wage and Hour Act. Because Mr. Armento's work was essential to ABCCM's mission as a non-profit, it was part of their job market. They said that they would have to find someone else to do the work if he did not do it, whether it be a volunteer or somebody who they hired, the work would have to get done. And so it was work that was essential to their operations and the act was intended to cover it. The act was certainly intended to cover these relationships of unequal bargaining power. And the situation of a homeless veteran who is dependent on an organization for his very survival in some surely shows and surely is intended to be covered by the Fair Labor Standards Act and the North Carolina Wage and Hour Act. These persons need a place to live and they need a wage that allows them to eventually move out and be self-sufficient. In terms of the chilling effects that Judge Rushing, I believe, asked about, there is nothing to stop ABCCM from using community volunteers. Community volunteers would not be in an economically coercive relationship with ABCCM. They would not be expecting compensation. So there should be no reason why other non-profits or religious organizations couldn't turn to community volunteers as ABCCM does quite properly and not be expected to pay them. Finally, I just wanted to say that the North Carolina Wage and Hour Act applies when there's an employer-employee relationship unless there is an exemption. Non-profit organizations are covered by the act. There is no exemption for rehabilitative work. There is no exemption for volunteers where there's an employer-employee relationship. There is an exemption for prisoners and there was some discussion of a prisoner case, which is inapplicable because the standard under the Fair Labor Standards Act is different. But because Mr. Armento was in an employer-employee relationship under the Alamo Foundation test and under the economic realities of the situation, we ask that the court decide in his favor and remand to the district court for findings as to damages. Thank you. Thank you very much. Counsel, we appreciate your arguments on both sides, all counsel. And as you know, in the Fourth Circuit, we usually come down and shake hands at the end of the argument. Obviously, we can't do that today. Right, exactly. But we are very glad to have you here and we hope soon this will all be a distant memory and not reality. Thank you very much for your arguments. Thank you. Thank you, Your Honor. And can we have court adjourned? Dishonorable court stands adjourned until tomorrow morning. God save the United States and dishonorable court.
judges: Diana Gribbon Motz, Henry F. Floyd, Allison J. Rushing